McDONALD, Appellant, v. PETERS, Respondent.

No. 9235.

Submitted January 12, 1954. Decided May 19, 1954.

Rehearing Denied July 30, 1954.

272 Pac. (2d) 730.

242

Mr. Lloyd A. Murrills, Cut Bank, Mr. W. R. McDonald, Browning for appellant.

Messrs. Frisbee and Moore, Mr. John P. Moore, Cut Bank, for respondent.

Mr. Murrills and Mr. Moore argued orally.

MR. JUSTICE FREEBOURN:

This is an action for money loaned in which the jury found its verdict for defendant and respondent Peters. From a judgment in favor of Peters the plaintiff and appellant McDonald appeals.

Plaintiff alleged in his amended complaint: "That from the first day of June 1951 to the 30th day of October 1951 the plaintiff loaned to the defendants at their special instance and request at different times, sums of money amounting to a total sum of seventeen thousand three hundred and four and no/100 dollars ($17,304.00) which the defendants promised to repay to the plaintiff, on demand," and "that the defendants have repaid all of the money loaned to them as aforesaid, except the sum of four thousand eight hundred and eight and no/100 dollars ($4,808.00) and that the defendants refuse to pay the said balance of $4,808.00, although plaintiff has demanded that defendants pay said balance."

Such allegations were denied by the defendants Peters and his wife, Rose Peters, and the action as to Rose Peters was dismissed during the trial.

Appellant's brief contains the following:

"The theory of the plaintiff's case is that he loaned $12,150 to the defendants for the purchase of mature cows and that all of these loans were repaid except $4,807.76.

"The theory of the defendants' case is that the plaintiff did

not loan the defendants any money for the purchase of cows, but that all the checks given by the plaintiff to Jim Peters were for the purchase of contracts with Indian ranchers to deliver calves in the fall.''

The trial judge, by appropriate instructions, informed the jury that the parties had adopted such theories.

Under the allegations of the amended complaint and under his own theory, the burden rested upon plaintiff to prove by a preponderance of the evidence that he had loaned the money in question to defendant before he was entitled to a verdict against defendant.

''The party holding the affirmative of the issue must produce the evidence to prove it; therefore the burden of proof lies on the party who would be defeated if no evidence were given on either side.'' R. C. M. 1947, sec. 93-1501-1. The burden throughout is on him who has the affirmative of an issue. DeSandro v. Missoula Light & Water Co., 48 Mont. 226, 136 Pac. 711. Under this section the party asserting a right in any case has the burden of proving each of the material allegations of his cause of action. Tucker v. Missoula Light & R. Co., 77 Mont. 91, 250 Pac. 11.

This being a law case, it was for the jury to determine, under the trial court's instruction, whether or not plaintiff had sustained the burden of proof and was entitled to a verdict herein. It was also the province of the jury to determine what the facts were and to which witnesses credence should be given in determining such facts.

''All question of fact [in law cases], where the trial is by a jury * * * are to be decided by the jury * * *.'' R. C. M. 1947, sec. 93-2501-1. See Gilmore v. Mulvihill, 109 Mont. 601, 98 Pac (2d) 335. ''The jury * * * are the judges of the effect or value of evidence addressed to them * * *.'' R. C. M. 1947, sec. 93-2001-1.

Under section 93-2001-1, supra, the trial court, as was done in the instant case, should on all proper occasions instruct the jury that:

"2. They are not bound to decide in conformity with the declarations of any number of witnesses, which do not produce conviction in their minds, against a less number, or against a presumption or other evidence satisfying their minds;

"3. That a witness false in one part of his testimony is to be distrusted in others;

"4. That * * * the evidence of the oral admissions of a party [should be viewed] with caution;

"5. That in civil cases the affirmative of the issue must be proved, and when the evidence is contradictory the decision must be made according to the preponderance of the evidence * * *."

Plaintiff was entitled to a verdict only if he proved the loans, as alleged in his amended complaint, not only by a preponderance of the evidence, but by satisfactory evidence.

"The evidence is deemed satisfactory which ordinarily produces moral certainty or conviction in an unprejudiced mind. Such evidence alone will justify a verdict. * * *" R. C. M. 1947, sec. 93-301-13.

Plaintiff's own testimony, given on direct and cross-examination, would tend to create in the mind of an unprejudiced person a doubt as to the justice of his cause. Certainly, after one reads all the evidence and the instructions given by the trial judge, one must conclude that the jury could properly reach no other verdict but one in favor of defendant.

The amended complaint alleges that plaintiff loaned defendant "sums of money amounting to a total sum of seventeen thousand three hundred and four and no/100 dollars ($17,-304.00)." Yet his testimony shows:

"Q. Have you any other checks in your possession other than the exhibits 1 to 10 which represent monies loaned by you to J. D. Peters? A. Loaned to him?

"Q. Yes. A. No, I haven't.

"Q. Just the total of the amount set out in plaintiff's exhibits 1 to 10? A. $12,150.00, I believe.

"Q. You made no other loans to Mr. Peters? A. I don't think so.

"Q. How does it happen in your complaint—apparently there is no complaint.

"The Court: Just a minute. It is not verified. The first amended complaint is signed by the attorneys but the verification is not signed.

"Q. How does it happen that you stated you loaned him $17,304.00? A. Well, they wrote this up without me being around there. That's for sure. * * *

"Q. Your complaint states you loaned him seventeen thousand dollars. That is not correct, is it? A. It is not. I loaned $12,150.00 on cows and he has $19,200.00 on calf money which was given to him. * * *

"Q. This complaint you are now bringing this lawsuit on is not true, is it? A. I was under the impression we had a cow deal on the start and they brought in a calf deal."

Questioned as to the original complaint which was introduced in evidence as defendant's exhibit No. 12, which alleged that "Joe McDonald and Charles Hodson" were plaintiffs and "are now and all times mentioned in this complaint, have been co-partners engaged in the business of buying and selling livestock" and that "defendants are indebted to the plaintiffs in the sum of four thousand eight hundred and eight and no/100 dollars for money had and received by the defendants to the use of the defendants," the testimony of plaintiff shows:

"Q. You signed the defendant's exhibit No. 12 in which Joe McDonald and Charles Hodson are named jointly as the plaintiffs and yet your testimony is here now that Mr. Hodson never had any interest in the deal? A. That is right; he never did.

"Q. How does it happen that his name was on that first complaint and you signed a verfied complaint stating that? A. Mr. McDonald [one of plaintiff's attorneys] had made a mistake when he wrote that up * * *.

"Q. Did you read the complaint before you signed it? * * * A. I probably never.

"Q. You signed a statement [the verification] to the effect that you have read the within complaint and know the contents thereof and that the same is true except as to matters stated on information and belief. You signed that statement without reading the complaint? A. I probably did."

In making out his case in chief plaintiff testified:

"A. The first dealing I ever had with Jim was, I think, [sometime in June 1951]. I either bought some calves, contracted some calves, or I bought five yearling steers from him.

"Q. You paid for these in full? A. Yes, sir.

"Q. And did you have some other transaction with him? A. Right after that I think I bought two cows and a yearling from him.

"Q. Did you pay for those in full? A. Yes, sir. * * * Well, he got some cattle that he had shipped either from Butte or Great Falls—I am not sure which town—and they held up the money for him on these brands.

"Q. * * * Now, I ask you about the first transaction relating to this lawsuit * * *. A. He came down to the house and the cattle he had shipped—the brands was tied up and the money was held on account of the brands. * * * So I loaned —gave him two thousand dollars * * * and whenever the check came in he would endorse the check and give it to me.

"Q. Did he ask for a loan at this time? A. No, I told him as far as what money I have he could make on buying them cows was his. I let him use this money."

Exhibits 1 to 10 (checks totalling $12,150), being called to his attention, he testified: "Well, they all represent money that I gave Mr. Peters—* * * to buy cattle with."

In rebuttal plaintiff placed in evidence checks, plaintiff's exhibits 148 to 162, amounting to $17,500 which he claimed covered the calf deals with defendant.

The court, however, by instruction No. 7, to which no objection was made, limited the purpose of such checks, and

instructed the jury as follows: "You are instructed that you cannot consider plaintiff's exhibits 148 through 162 for the purpose of establishing any indebtedness set out in plaintiff's amended complaint, or for the purpose of reaching any amount which plaintiff in his complaint alleges as having been loaned by him to the defendant, J. D. Peters."

Instructions given, whether right or wrong, constitute the law of the case and the jury must follow them. Metcalf v. Barnard-Curtiss Co., 120 Mont. 50, 180 Pac. (2d) 263.

·Although the burden of proof was upon plaintiff, nevertheless the defendant offered proof and the jury could have found such to be the fact, that the money given defendant by plaintiff was not a loan for defendant's personal use, but was money to be used and was used by defendant to buy calves, for future delivery, and that in buying such calves defendant was using such money and acting for plaintiff.

The testimony of Rose Peters shows that the calves referred to are "the Indian calves on the Browning Blackfeet Indian Reservation. * * * and Jim says, 'I guess I am going to let Charlie [Hodson] have these Indian calves.' He said 'Thirty-three cents a pound for them and weighed straight up'—that means weighed without any shrink taken off. * * * then for a couple of weeks after that he [Peters] kept on contracting the calves from different Indians and on his own then he went and called Charlie Hodson if he wanted the calves. * * * Charlie Hodson told him on the phone to get in touch with Joe McDonald. * * * [Peters did get in touch with] Joe McDonald. * * * he gave Jim a check to cover payment for twenty dollars a head down on these calves for Charlie Hodson. * * * Then we just went on and kept contracting calves and every time Jim would get a hundred head of calves then he would sign a contract between himself and Joe McDonald and Joe McDonald would give him a check for twenty dollars a head down on those calves."

Defendant's exhibits 13 to 133 were "* * * carbon copies of the contracts that were signed up between Jim Peters and

Blackfeet Indians on calves and also the checks, the cancelled checks of Jim Peters that were paid on those contracts.''

As to defendant's exhibits No. 134 to 139, "These are carbon copies of contracts that were signed between Jim Peters and Joe McDonald'' and they refer ''to the self-same calves that were contracted from the Indians by Jim Peters upon the Browning Reservation.''

Referring to plaintiff's exhibits 1 to 10, covering the money plaintiff said he loaned defendant, Mrs. Peters testified: ''They are checks that were given to Jim from Joe McDonald as part of that twenty dollars a head that he paid out on his calves.''

According to Mrs. Peters the money advanced to the Indians on the calves amounted to $18,522.96; ''$5,015.21 was money Jim Peters put in on his own and $13,507.75 was Charlie Hodson and Joe McDonald's money.'' Speaking of how this money was to be returned to McDonald, Mrs. Peters testified: ''Well, Jim Peters and Charlie Hodson and Joe McDonald had an agreement that when the calves came in that Mr. McDonald would take all the advance money that had been paid, regardless of whether it was Mr. Peters' or Charlie's money or his, and he would collect all the advance money until the calves were all delivered and the contracts had been all filled by the Indians; then they were to get together, of course, and have a settling up and find how much extra money that Jim had paid on those calves, and he was to get this commission and the shrinkage—2% shrink was to be paid to him at the end of the deal. * * * It [Jim's commission] was a cent a pound. * * * 2% shrink is two dollars a hundred * * *.''

The evidence would indicate that all of the calves contracted for and upon which money had been advanced to Indian owners were not delivered, which resulted in, as Mrs. Peters testified, McDonald saying: '' 'These cattle better all come in or somebody is going to get sued.' * * * Joe McDonald said at that t'me, 'Well they haven't all come in yet. We will set another shipping date and keep trying until we get them all in.' Next thing we knew our checks both started to bounce up at Brown-

ing and our bank accounts were tied up—both of us. * * *
Charlie Hodson and Joe McDonald attached both of them as
far as we knew. The last thing we knew of the deal they were
going to set another shipping date and try to get the balance
of these calves. * * * the bank accounts were tied up and an
attachment put on our bank accounts and we were never—he
was never able to finish the deal to get to the end—the final
settling up." The calves contracted for were, "Eight hundred,
I think, upon which $20.00 a head was paid down, and the
calves actually delivered were 641; something like that."

Appellant complains of the admission of his original com-
plaint in evidence over his objection. Such original com-
plaint showed plaintiff's position therein to be inconsistent with
the position taken in the amended complaint, and allegations in
such original complaint tended to contradict parts of his oral
testimony. Such original complaint was properly permitted in
evidence. Johnson v. Butte & Superior Copper Co., 41 Mont.
158, 108 Pac. 1057, 48 L. R. A., N. S., 938; 31 C. J. S., Evidence,
sec. 303(c), p. 1079.

We have examined the other assignments of error and find
no merit in them.

For the foregoing reasons the judgment of the district court
is affirmed.

MR. CHIEF JUSTICE ADAIR and MR. JUSTICE BOT-
TOMLY concur.

MR. JUSTICE ANGSTMAN (dissenting):

I agree, of course, that plaintiff had the burden of proving
his cause of action before he was entitled to a verdict. I think
he sustained that burden by clear and convincing evidence. In
fact, the evidence was not disputed by credible evidence. He
produced the cancelled checks showing the amount of the loan
made by him and he produced evidence that defendant Peters
and his wife admitted that defendant Peters owed plaintiff the
amount claimed.

In support of plaintiff's case he submitted proof showing that he loaned $12,150 to defendant for the purchase of cows. Ten cancelled checks were introduced in evidence as exhibits numbered 1 to 10, made payable to Jim Peters and executed by plaintiff with the dates and amounts as follows: July 23, 1951, $2,000; July 25, $2,500; July 27, $1,000; July 28, $1,000; August 24, $1,000; August 27, $1,000; September 7, $650; September 16, $500; September 19, $1,000; August 6, $1,500. The ten checks total $12,150. On the face of six of these checks were written the words "for cows."

Plaintiff also introduced testimony of several witnesses who were present at a meeting in Browning at which meeting Jim Peters and his wife admitted that Peters owed plaintiff the sum of $4,807.76.

Defendant Peters denied that plaintiff loaned him any money for the purchase of cows, but testified that the checks given by plaintiff to him were for the purchase of contracts with Indian ranchers to deliver calves in the fall. He introduced in evidence exhibits 134 to 139, each of which is called "Live Stock Bill of Sale and Contract." These showed the sale by Peters and the purchase by plaintiff at 33¢ per cwt. of a stated number of calves to be delivered on or before a fixed time with two per cent shrinkage. Each states the amount of money received as part payment. The dates, number of calves and amounts stated as part payment are as follows:

| Exhibit 134 | July | 27, 1951 | 300 calves | $6,600 |
| Exhibit 135 | July | 2, 1951 | 100 calves | $2,200 |
| Exhibit 136 | July | 7, 1951 | 100 calves | $1,100 |
| Exhibit 137 | July | 10, 1951 | 100 calves | $2,200 |
| Exhibit 138 | July | 19, 1951 | 100 calves | $2,200 |
| Exhibit 139 | August | 3, 1951 | 100 calves | $3,200 |

Total ........................................................................................$17,500

Defendant testified in substance that the checks, offered by plaintiff, being exhibits 1 to 10, were in payment for these contracts for the purchase of calves.

In rebuttal plaintiff admitted that he purchased the contracts, exhibits 134 to 139, inclusive, but denied that the checks represented by exhibits 1 to 10 represented payment for these calf contracts. He then introduced in evidence exhibits 148 to 162 which he said were the checks given in payment of the calf contracts. Exhibits 148 to 162 are all checks given by plaintiff to Jim Peters in 1951, the dates and amounts being as follows:

| | | | |
|---|---|---|---|
| Exhibit 148 | June | 22 | $2,442.00 |
| Exhibit 149 | June | 23 | $1,000.00 |
| Exhibit 150 | June | 25 | $1,000.00 |
| Exhibit 151 | June | 27 | $1,000.00 |
| Exhibit 152 | June | 27 | $ 758.00 |
| Exhibit 153 | June | 29 | $1,000.00 |
| Exhibit 154 | June | 30 | $1,200.00 |
| Exhibit 155 | July | 7 | $1,100.00 |
| Exhibit 156 | July | 9 | $2,200.00 |
| Exhibit 157 | July | 19 | $2,200.00 |
| Exhibit 158 | July | 30 | $1,200.00 |
| Exhibit 159 | August | 3 | $1,000.00 |
| Exhibit 160 | August | 19 | $1,000.00 |
| Exhibit 161 | August | 31 | $ 400.00 |
| Exhibit 162 | September | 5 | $ 600.00 |

Total ................................................$18,100.00

The record shows without controversy that defendant purchased and sold cows as well as calves. Peters admitted that in some cases he endorsed checks received on the sale of cows to plaintiff McDonald. McDonald's testimony was to the effect that payments on the loan represented by the checks, exhibits 1 to 10, were made in this manner and the indebtedness thus reduced from $12,150 to $4,807.76.

Peters and his wife, in explaining the conversation testified to by plaintiff's witnesses in which they admitted that Peters owed the $4,807.76 to plaintiff, said it was tied up in the calves that the Indians did not deliver.

Peters offered no explanation of the checks, exhibits 148 to 162. Plaintiff's explanation that they furnished the consideration for the calf contracts is not directly disputed and is the only reasonable explanation in the record. The total consideration for the bills of sale contracts for the calves, exhibits 134 to 139, inclusive, was $17,500. This is the sum total of the checks, exhibits 148 to 161 inclusive, whereas the checks involved in plaintiff's complaint, exhibits 1 to 10, inclusive, amount to $12,150.

The $600 check, being exhibit 162, was explained by plaintiff as being a down payment on some cattle bought from Harvey Monroe and not included in exhibits 134 to 139. Likewise the date of the checks, exhibits 1 to 10, and the respective amounts indicate that they were not the checks given in payment for the calf contracts. Whereas the dates of the checks, exhibits 148 to 161, inclusive, do correspond quite closely with the dates and exactly with the amounts contained in the calf contracts, exhibits 134 to 139, inclusive.

Defendant's testimony to the effect that checks represented by exhibits 1 to 10 were in payment of the calf contracts was so completely overcome by documentary evidence (exhibits 148 to 161 inclusive) as to leave no room for a difference of opinion by reasonable men, where as here, there was no other explanation offered and the record stands uncontradicted that the checks represented by exhibits 148 to 161, inclusive, were given in payment of the calf contracts and where they represent exactly the amount incurred on calf contracts. There were no other calf contracts to which exhibits 1 to 10 could apply.

Likewise six of the checks embraced in exhibits 1 to 10 show on their face that they were given "for cows" and plaintiff's evidence shows that they all represented loans to defendant for the purpose of buying cows.

Court's instruction No. 7 referred to in the majority opinion and made the basis of that opinion, does not affect the question before us and learned counsel for defendant did not rely upon it either in oral argument or in the brief. It simply told

the jury that they were not permitted to consider exhibits 148 through 162 in establishing the indebtedness alleged in the complaint or in reaching the amount of the loan relied on by plaintiff.

Plaintiff is not relying upon any of the amounts embraced in exhibits 148 through 162 in establishing his claim. He relies on exhibits 1 through 10 for that purpose. He testified regarding exhibits 148 through 162 to rebut the claim of defendant that the money from checks 1 to 10 went for the calf contracts. Plaintiff simply showed that the calf contract money came from other checks not involved in this action and numbered 148 to 162, inclusive. Instruction No. 7 did not furnish an excuse for the jury to find for defendant nor for the trial court nor this court to uphold the jury's verdict.

I think this case calls for application of the statement made by the Supreme Court of California in Driscoll v. Market St. Cable Ry. Co., 97 Cal. 553, 32 Pac. 591, 33 Am. St. Rep. 203, and quoted with approval by this court in Casey v. Northern Pac. R. Co., 60 Mont. 56, 198 Pac. 141, 145, as follows: " 'When a jury catches at a semblance or pretense of evidence for the purpose of somewhat equalizing financial conditions by taking money away from one party and giving it to the other without legal cause, the trial judge should, without hesitation, set the verdict aside; and in the event of his not doing so, this court will grant a new trial'."

Nor do I think that plaintiff should be deprived of his money because of the difficulties encountered by his counsel in drafting a complaint properly setting forth the facts. I agree that it was proper to admit in evidence the original complaint filed in the case. I do not agree that it showed plaintiff's position therein to be inconsistent with the position taken in the amended complaint, as stated in the majority opinion. But it did contain statements differing from those in the amended complaint and was admissible as declarations against interest within the rule stated in Gardiner v. Eclipse Grocery Co., 72 Mont. 540, 234 Pac. 490.

254

I think the verdict should be set aside and judgment reversed.

MR. JUSTICE ANDERSON:

I concur in the foregoing dissenting opinion of MR. JUSTICE ANGSTMAN.