CARL GUIDICI and HENRY MEINE, Plaintiffs and Respondents, v. MINERALS ENGINEERING COMPANY, BLAIR BURWELL, LEONARD A. SCHULZ, GEORGE FLEMING and R. M. FLEMING, Defendants and Appellants.

No. 9863.
Submitted October 26, 1959. Decided January 5. 1960.
348 Pac. (2d) 354.

390

See **C. J. S.** Mines and Minerals, § 189.

Leonard A. Schulz, McFadden & Davis, Dillon, Emigh & Carmichael, Butte, for appellants. Leonard A. Schulz, and Theodore F. McFadden, Dillon, argued orally.

Collins & Burns, Dillon, Maury, Shone & Sullivan, Butte, for

respondents. John Collins, Richard F. Burns, Dillon, and A. G. Shone, Butte, argued orally.

MR. JUSTICE CASTLES delivered the Opinion of the Court.

This is an appeal from a judgment in favor of the plaintiffs in two actions between the same parties. The cases were consolidated for trial before the District Court, without a jury, and likewise by stipulation are consolidated on this appeal.

In the first cause, plaintiffs, respondents here, were awarded judgment against defendants, Minerals Engineering Company and Blair Burwell, for royalties at the rate of $2,172.42 per month, for a period from October 1, 1953, to and including December 1, 1954, or a total of $32,586.30, plus interest, all in virtue of a mining lease.

In the second cause, plaintiffs were awarded judgment, under the same lease against the same defendants, for royalties at the same rate for the period from January 1, 1955, to and including February 1, 1956, for a total of $30,413.88, plus interest. Plaintiffs also recovered from defendants the further sum of $5,928.25 by way of additional royalties on ores mined and stockpiled pursuant to the same lease.

The lease provisions are the key to the determination of this cause, and therefore the pertinent parts of the lease will be set out rather fully by paragraph numbers as they appeared in the original lease so that for brevity, in the discussion hereafter, certain paragraphs will be referred to simply by number. The lease provisions are as follows:

"To Have and to Hold unto said Lessee for the term of ten (10) years from the date hereof, expiring at noon on the 30th day of August, 1961, unless sooner forfeited or determined through the violation of any covenant or agreement herein required to be performed by the said Lessee, but with the right and option of renewal for a like period of ten (10) years upon the same terms and conditions as in this Lease and agreement recited, if this said Lease and Agreement is fully performed by

the Lessee and the property is in operation at the expiration of the original term herein let and demised.

"In consideration of such demise, the Lessee covenants and agrees with the Lessors as follows, to-wit:

"A. To pay to the Lessors within fifteen (15) days after the execution and delivery of these presents, and prior to entering into the possession of said properties, the sum of Four Thousand Dollars ($4,000), lawful money of the United States of America, said payment as made to be credited by said Lessors as advance payment on royalties as hereinafter provided.

"B. To thereupon enter upon said mines, mining claims and premises and investigate the same, including the performance of sampling, excavation of pits, trenches and open cuts, or underground work, and other work including engineering and geological work necessary to develop the properties for mining, and to conduct said work and all thereof in a continuous manner with due diligence and in accordance with sound mining practices, unless prevented by inclement weather or acts of God beyond which the Lessee has no control, and, in connection with all of such preliminary work, to expend not less than the sum of Ten Thousand Dollars ($10,000), and upon application of said Lessors, said Lessee further agrees to make satisfactory showing as to how said sum has been expended upon said properties.

"C. To either release of record the said Lessors from this Lease and Agreement by written notice to them to such effect on or before the 1st day of April, A. D., 1952, or, on or before said date, to give written notice to said Lessors of election to proceed under the terms of this said Lease and Agreement, and thereafter carry out and fulfill, as Lessee, the terms, covenants and conditions as follows, to-wit:

"I. (a) To pay to said Lessors as rents or royalties, and in the manner hereinafter set forth, upon all tungsten, ores, minerals and materials mined and stockpiled from said demised premises, a royalty advance in the sum of Fifty Cents

(50¢) per wet ton of Two Thousand (2,000) pounds, said royalty advance to be credited to the milling royalty as next hereinafter recited.

"(b) To pay to said Lessors as rents or royalties, and in the manner hereinafter set forth, upon all tungsten, ores, minerals and materials mined and milled from said demised premises, a royalty in a sum equal to Five Per Centum (5%) of the gross millhead without deduction, said gross millhead without deduction being determined for the purpose of this Lease and Agreement by taking the tungsten (and/or other mineral) content ascertained by weights and assays and multiplying this initial factor by the average previous monthly price for said tungsten (and/or other mineral) as recited in the Engineering & Mining Journal, or other standard publication containing price quotations currently, plus the total of then existing governmental subsidies awarded, and for the purpose of this royalty to then ascertain Five Per Centum (5%) of this final figure.

"II. To pay to said Lessors all royalties and royalty advances on production as aforesaid on a monthly basis, excepting as hereinafter qualified, commencing on the 1st day of each and every succeeding month following such stockpiling or milling.

"III. To pay to said Lessors commencing on the 1st day of April, A. D. 1952, and on the first day of each and every month thereafter to and including the 1st day of December, A. D., 1952, a minimum royalty in the sum of Two Thousand Dollars ($2,000) per month, all of which royalty shall be considered as advance royalty and be credited by the said Lessors on future milling royalties found due and owing, all as hereinbefore set forth, and such minimum monthly royalty shall be payable and paid until such time as the production from the mining properties herein let and demised equals and/or exceeds the monthly minimum royalties as in this sub-paragraph set forth. In the event that following payment of said royalty advance as herein set forth a default in production, from any

cause, results, advances theretofore paid the said Lessors by the said Lessee shall be retained by said Lessors as and for a reasonable rental for said properties and as liquidated damages and not considered as a forfeiture.

"IV. To thereafter, and during the life of this Lease and Agreement, and any extension thereof under the option terms hereinbefore granted, to pay to said Lessors a minimum royalty from and after the first day of January, A. D. 1953, in the sum of Three Thousand Five Hundred Dollars ($3,500) all as in Paragraph III immediately above set forth, Provided, Nevertheless, that during the months of January, February, and March of each and every succeeding year during the term hereof, said Lessee may, at his exclusive option, pay said minimum royalty on either a monthly basis as aforesaid or await the expiration of the quarter, or any portion thereof, to make said payment, with provisions in default of production as in said Paragraph III contained.

"V. To thereafter, and during the entire life of the Lease and Agreement, or extension thereof, to perform according to law all necessary annual assessment work on all of said mining claims and file the necessary affidavits on or before the due date thereof in each and every year during the term hereof. In the event of further locations of claims or fractions of claims at the instance of the Lessee, the same shall be taken in the names of the Lessors, but the same immediately thereupon shall be considered included in the every term and provision of this Lease and Agreement, and to furnish to the Lessors, from time to time, and as compiled and prepared, copies of all maps, reports, assays and other data resulting from the examination and investigation of such mines, mining claims and mining properties, and to allow the Lessors and/or their agents, at any reasonable time, to enter in and upon said mines, mining claims and mining properties for purposes of inspection and general investigation, and at any time to take samplings from said mines, mills or stockpiles for the purpose of assay, or other-

wise, and said Lessors shall be given upon receipt duplicate copies of all assays, pulps, reports, and other information in relation to the operation of said properties, and to take out, carry and maintain full industrial insurance for any and all persons employed in or upon said premises by the Lessee, and to conduct all operations so as to comply fully with the laws of the State of Montana, and the United States, relating to mining, safety regulations and in every other respect, and to conduct any and all operations in approved mining fashion, and not to commit waste nor permit the filing or assertion of materialmen's liens, mechanic's liens or other encumbrances against any of said properties, and to post notices in at least three (3) conspicuous places on the mining property showing that the property is being operated by the Lessee and that all creditors must look to the said Lessee for payment of any accounts incurred after operations commence by the Lessee, and to hold harmless the Lessors, and each of them, from any and all claims or demands arising or growing out of the exploration, development or operation of said properties by the Lessee, and to comply with the Federal and State laws in regard to Social Security, Unemployment Compensation and withholding of taxes.

"VI. All payments to the Lessors herein to be by the Lessee made, shall be timely made by said Lessee as herein agreed, to the credit of the Lessors at the State Bank & Trust Company, at Dillon, Montana.

"VII. In the event of the erection of concentrating mill by the Lessee or his assigns, or at the instance of either, on or near the properties herein let and demised, first priority in processing shall be and is hereby afforded and given the ores from the premises herein leased, to the then existing capacity of said mill.

"VIII. Upon violation of any covenant or covenants hereinabove recited, this Lease and Agreement, at the option of the Lessors or their agents, may thereupon, after sixty (60) days

due notice in writing to the Lessee at 801 4th Avenue, Box 957, Grand Junction, Colorado, and provided the deficiencies complained of therein have not been corrected within said period by the Lessee, enter upon said premises and dispossess all persons occupying the same hereunder, and the said Lessors shall thereupon, in case of such termination, retain all considerations theretofore received by them as liquidated damages for nonperformance, and as an exclusive remedy, but, the Lessee shall have the right to remove his machinery and equipment, not of a real nature, from said properties for a period of ninety (90) days after any such termination, but, *all subject, however, to the express condition that termination of this Lease and Agreement may not be given by the Lessors, and the said Lease and Agreement may not be terminated by them because of any failure to perform on the part of the Lessee in the event conditions in the tungsten market are such as to prevent or preclude the mining of such ore on a profitable commercial basis, after the Lessee has provided all usual facilities to market or treat the raw material and market it, the understanding in this behalf being that all minimum monthly royalties and all other covenants and conditions, except the assessment work, on the part of the Lessee shall be suspended during any such adverse market condition, but immediately upon the improvement of the market conditions to the point of economic feasibility for mining operations, the Lessee to be required to perform all covenants and conditions heretofore set forth.* In the event of disagreement between the parties hereto as to the existence of conditions permitting such cessation of operations as in this paragraph set forth, or in the event of disagreement between said parties as to any term or provision in this Lease and Agreement contained, the matter or matters in issue shall be presented for final determination and arbitration to an Arbitration Committee as hereinafter set up, and all parties hereto do irrevocably covenant and agree to abide and be bound by the resulting determination of said Arbitration Committee. * * *

''XI. Time is expressly made the essence of this Lease and Agreement, together with each and every covenants [sic] and agreement to be performed, and each and all of said covenants and agreements as herein contained are agreed and recited to be material.'' Emphasis supplied.

The mineral lease in question covered unpatented quartz lode mining claims. The mining claims were originally owned by the respondents, Guidici and Meine, and one R. M. Fleming, one of defendants and appellants. They were the Lessors, and one Blair Burwell, one of the appellants, was the Lessee. The interest of each of the parties in the mining claims varied somewhat, but that is not important to this decision. Burwell sold and assigned to the appellant, Minerals Engineering Company, all of his right, title and interest in and to the lease on March 11, 1952. Burwell is President of the Company.

When the lease was executed Sugarloaf Claims Nos. 9 through 29 were owned by Guidici, Meine and R. M. Fleming in equal shares; and Sugarloaf Claims Nos. 1 through 8 were owned twenty-five percent by Guidici, twenty-five percent by Meine and fifty percent by R. M. Fleming. Shortly thereafter R. M. Fleming sold and conveyed his interest in said claims and lease, so that early in 1952, the title to and ownership of the claims became vested as follows:

A. As to Sugarloaf Claims Nos. 1 through 8, inclusive, Meine owned twenty-five percent; Guidici owned twenty-five percent; Minerals Engineering Company owned twenty-four percent; the appellant, George M. Fleming, owned twenty-four percent; and the appellant, Leonard A. Schulz, owned a two percent interest.

As to Sugarloaf Claims Nos. 9 through 29, inclusive, Meine owned thirty-three and one-third percent; Guidici owned thirty-three and one-third percent; Minerals Engineering Company owned sixteen percent; George M. Fleming owned sixteen percent; and Leonard A. Schulz owned a one and one-third percent interest therein.

This was the ownership during all of the period involved until May 18, 1955, when George M. Fleming sold all of his interest to Minerals Engineering Company. The importance of the ownership in the claims is only to show the fact that the Lessors and Lessee were tenants in common other than under the working conditions of the lease. There is no dispute as to the amounts owned by each of the parties. It will be seen that only two of the original Lessors, that is, Guidici and Meine, are plaintiffs and respondents; the other owners were joined with the Minerals Engineering Company as defendants and appellants.

Minerals Engineering Company, the Lessee, paid all of the royalties which accrued under the lease prior to October 1, 1953, but paid no royalties thereafter to the respondents. They did, however, continue to pay royalties to Fleming until March 1955. On October 20, 1953, the respondent Meine, caused a notice to be served on Minerals Engineering Company, wherein and whereby he notified the Company that it was in default in the performance of the lease by having failed to pay the minimum monthly royalty which became due on October 1, 1953; that the notice was given pursuant to Paragraph VIII of the lease; and that unless the default was corrected within sixty days after the date of the notice, the Company would be dispossessed of the claims embraced by the lease.

Under date of January 9, 1954, the Company notified Meine, in writing, that its failure to pay such royalty was occasioned by the *conditions obtaining in the tungsten market, which then and for more than four months prior thereto, had been such as to prevent and preclude the mining of ores from the claims on a profitable commercial basis,* the Company having provided all usual facilities to market and treat such ores; that the Company had conducted and would continue to conduct extensive exploration work upon the claims in an effort *to locate ores thereon of sufficient quantity and value to permit the mining of the same on a profitable commercial basis;* and that if and

when the Company found such ore, it would immediately resume payment of the minimum royalty provided for in the lease.

Under date of November 14, 1953, both respondents, Meine and Guidici, caused a notice to be served on the Minerals Engineering Company, wherein and whereby they notified the Company that it was in default in the performance of the lease by having failed to pay the minimum monthly royalties and that unless the default was corrected within sixty days, the Company would be dispossessed as had been previously given in the notice by Meine alone.

On January 9, 1954, the Company notified both respondents as it had previously notified Meine, that is, to the effect that profitable commercial operations could not be conducted under existing market conditions and that therefore under the terms of the lease, minimum monthly royalties would not be paid.

The issues joined by the pleadings are as follows: The respondents filed the complaint in the first cause seeking to recover from the appellants, Burwell and Minerals Engineering Company, their proportion of each of the $3,500 minimum monthly royalties, which they alleged accrued under the lease as of October 1, 1953, and on the first day of each succeeding month to and including December 1, 1954.

A second action was filed between the same parties on February 7, 1956, seeking to recover the same minimum royalty payments for the succeeding lease period. That is, from January 1, 1955, to February 1, 1956. In the second cause of action, the respondents also prayed for an accounting of all ores and minerals mined and stockpiled by the Company from the claims beginning January 1, 1955, up to February 1, 1956.

The appellants' answers to respondents' complaints denied that any royalty accrued under the lease as of October 1, 1953, or at any time thereafter, and further denied that they were indebted to the respondents in any amount by virtue of the lease, or otherwise. The answers further alleged by way of an

affirmative defense, that at all times during the period between October 1, 1953, and the commencement of the second action on February 7, 1956, conditions in the tungsten market were such as to preclude the mining of ores from the claims on a profitable commercial basis after the Company had provided all the usual facilities to market or treat the raw material as the contract provided; that during all of said times the Company had conducted an extensive exploration, development and investigative work upon the claims in an effort to locate ores of sufficient quantity and value to permit the mining thereof on a profitable commercial basis, and in connection with the conduct of such work had mined and extracted from the claims certain ores, all of which it had thereafter caused to be milled and refined.

The answer in the first cause of action further affirmatively alleged that the value of the ores so recovered from the claims during the period embraced by the action amounted to $29,-879.64, but that the reasonable cost of the mining, milling, transporting and refining such ores amounted to $60,500.29, thus resulting in a loss to the Company of $30,620.65.

The answer in the second cause of action affirmatively alleged that the value of the ores recovered from the mining claims during the period there involved amounted to $154,747.93; but that the reasonable cost of mining, milling, transporting and refining the ore amounted to $180,894.25, thus resulting in a loss to the Company of $26,146.32.

Each of the answers further affirmatively alleged the giving of notices by the respondents to the Company that unless it corrected the defaults therein mentioned, within sixty days, the lease would thereby be and become terminated pursuant to the provisions of the contract and the notices. It also affirmatively alleged that the Company answered the notices of termination by explanations as to why it had not made royalty payments provided for by the lease after October 1, 1953, which explan-

ations were as to the failure to have a profitable commercial production because of the condition of the tungsten market.

Respondents' replies denied the affirmative allegations of the appellants' answers save as to the giving of notices mentioned.

Before we shall discuss any of the evidence and the facts established thereby, we shall set up the appellants' specifications of error in order to direct our inquiry at an interpretation of the lease contract previously set out.

The appellant specifies thirty-seven separate errors, grouping them into five parts. The first grouping relates to the court's Findings of Fact and Conclusions of Law to the effect that the provision of the lease, contained in Paragraph VIII, which suspends the payment of all mineral royalties under the lease or other performance thereof by the Lessee (save assessment work on the claims) during any period that conditions in the tungsten market become such as to prevent and preclude the mining of ore on a profitable basis, is a repugnancy which must yield to other provisions of the lease.

The second grouping of error goes to the court's Findings of Fact on the tonnages mined and milled and whether or not the profit was or could be made and its conclusions of law that the appellants had failed to show, by a preponderance of the evidence, that there were conditions in the tungsten market such as to prevent or preclude the mining of ore from the demised premises on a profitable commercial basis, and as a matter of law had no excuse for failure to perform.

The third grouping of error goes to the court's failure to find facts and conclude in law that a termination of the lease had been effected by the respondents' notices of termination.

The fourth grouping of error goes to the court's findings that the Company had stockpiled ore from the premises and was indebted to the respondents for advance royalties.

The fifth grouping of error goes to the court's findings of

fact, and conclusions of law upon which judgment in the sums previously mentioned was given.

From this grouping of error, it is the appellants' contention that:

1. Neither Minerals Engineering Company, nor any of the other appellants, breached the lease in the particulars alleged by the respondents; the Company and other appellants performed all of the terms and conditions of the lease; and that at all times the lease has been and now is in full force and effect;

2. No repugnancy exists between the provisions of the lease;

3. If, notwithstanding the foregoing, the Company did not breach the lease by failing to pay the minimum monthly royalty which accrued on November 1, 1953, the lease was terminated and came to an end not later than sixty days after November 17, 1953, when the respondents served upon the Company a notice that it had defaulted in the performance of the lease by failing to pay the minimum monthly royalty which accrued on November 1, 1953, and that unless the default was corrected within sixty days the Company would be dispossessed of the claims; that upon the termination, the respondents became entitled to retain and they did retain all considerations theretofore received by them under the terms of the lease as liquidated damages for nonperformance, and as an exclusive remedy as provided in the lease;

4. The respondents are not entitled to the relief prayed for in either of their complaints upon which the consolidated actions were tried, and that the appellants are entitled to judgment dismissing the complaints upon the merits.

We shall discuss first the so-called repugnancy contained in Paragraph VIII of the lease, which the District Court found to be repugnant.

The provisions of the lease are plain and unambiguous, up to a point, and the intent of the parties unmistakable. The first clause in question provides for payment by the Lessee of cer-

tain, definite minimum royalties during the term of the lease. The second clause, contained in Paragraph VIII, merely modifies and limits the effect of the first, by providing that during any period the claims cannot be mined *under existing market conditions on a profitable commercial basis* payment of such minimum royalties shall be *suspended until improvement of adverse market conditions.*

We see no basis to call this second clause repugnant to the first if properly interpreted. The second clause by suspending payments during such adverse conditions merely modified the first, and seems to be an entirely reasonable and usual contractual safeguard for the Lessee of a mining property.

Our own statutes provide in section 13-702, R.C.M. 1947, that:

"A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful."

Section 13-707 provides:

"The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."

Section 13-709 provides:

"A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done, without violating the intention of the parties."

Also, courts must give effect to every part of a contract so ▮▮ as to make its terms operative; a new contract may not be made for the parties, nor other language read into or eliminated from the lawful terms thereof, unless the words employed are meaningless or an absurdity. Union Central Life Ins. Co. v. Jensen, 74 Mont. 70, 237 Pac. 518.

To show the general application of such "escape clauses" we will quote from 28 A.L.R. (2d) 1013, on an annotation entitled "Construction and effect of provision in mineral lease

excusing payment of minimum rent or royalty.'' It is said at page 1015:

''It is a common practice to insert in a mining lease a provision for a minimum royalty or rent. Usually the minimum is stated on an annual basis, although installment payments are often required to be made quarterly or monthly. There are several purposes in requiring such payments, the more common being to insure a steady income to the lessor and to spur the lessee into a prompt and diligent development and operation of the property.

''However, there are times when it would obviously be unjust to require the lessee to pay minimum rentals, and it is often impossible to induce a responsible miner to sign a lease requiring minimum payments unless there are certain exceptions or saving clauses. These clauses of exception assume an infinite variety of form and content, but almost all of them have in common *the element that no minimum payments shall accrue during a period when the lessee is prevented from operating because of circumstances beyond his control.* A wide variety of causes may be referred to in an excepting clause, including acts of God, strikes, epidemics, riots, war, interference by the government, car shortages and difficulties in transportation, floods, inadequate water supply, fires, explosions, breakdown of machinery, damage to improvements, inability to obtain supplies, machinery, or labor, faults in the mine, exhaustion of minerals, loss of the seam, and *the fact that the mineral is not of merchantable quality or cannot be mined and sold at a profit.''* Emphasis supplied.

We have also said that in constructing a contract we must reconcile all of its provisions if possible to do so. Backer v. Parker-Morelli-Barclay Motor Co., 87 Mont. 595, 289 Pac. 571.

Also section 93-401-21 provides:

''When the terms of an agreement have been intended in a different sense by different parties to it, that sense is to

prevail against either party in which he supposed the other understood it, and when different constructions of a provisions are otherwise equally proper, that is to be taken which is most favorable to the party in whose favor the provision was made.''

Also section 13-720 which provides:

''*Words to be taken most strongly against whom.* In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist. The promisor is presumed to be such party; except in a contract between a public officer or body, as such, and a private party, in which it is presumed that all uncertainty was caused by the private party.''

And section 93-401-16, which provides:

''In the construction of a statute the intention of the legislature, and in the construction of the instrument the intention of the parties, is to be pursued if possible; and when a general and particular provision are inconsistent, the latter is paramount to the former. So a particular intent will control a general one that is inconsistent with it.''

With the foregoing statutory rules and interpretation of such rules, by this court in mind, we cannot say that the savings or exception clause, concerning the tungsten market and profitable mining, contained in Paragraph VIII of the contract is in any way repugnant to the minimum royalty clause provisions. In this matter the District Court was in error.

Respondents argue at considerable length in their brief that because of the prior *position* in the lease of the minimum monthly royalty payments, that the requirement of payment of royalties must be permitted to stand. This rule of ''relative positions'' would not be applicable in such a situation as this where the second clause merely amounts to a modification, of the first, or a proviso of limitation thereon, as we hereafter interpret it. Mealey v. Kanealy, 226 Iowa 1266, 286

N.W. 500, 131 A.L.R. 945. We do not feel called upon to discuss whether or not the prior position rule would or would not be applicable in a given situation, because in the instant case, the second clause contained in Paragraph VIII is not repugnant to the minimum royalty clause appearing earlier in the lease, but is merely a modification thereof.

The next phase of the case is that *even if there were no repugnancy between the clauses as discussed previously,* the respondents insist that the clause providing for suspension of the payments *never became operative, because the price of tungsten and the market remained constant throughout the life of the lease prior to the commencement of the two actions.* It is clear from the record that the price of tungsten, without penalties for impurities, remained at a fixed price of $63 per unit.

Now, with the previously set out statutory rules and holdings of this court in mind, let us repeat the provision of Paragraph VIII which constitutes one of the defenses of the defendants against their failure to pay the minimum royalties as provided by the contract. That provision is as follows: "* * * all subject, however, to the express condition that termination of this Lease and Agreement may not be given by the Lessors, and the said Lease and Agreement may not be terminated by them because of any failure to perform on the part of the Lessees in the event *conditions in the tungsten market are such as to prevent or preclude the mining of such ore on a profitable commercial basis,* after the Lessee has provided all usual facilities to market or treat the raw material and market it, the understanding in this behalf being that all minimum monthly royalties and other covenants and conditions, except the assessment work, on the part of the Lessee *shall be suspended during any such adverse market condition, but immediately upon the improvement of the market conditions to the point of economic feasibility* for mining operations, the Lessee to be required to perform all covenants and conditions heretofore set forth." Emphasis supplied.

What is the meaning of this clause? The appellants insist that it means more than just market conditions that it means a profitable commercial operation under any condition; that is, that upon any proof of a failure to make a profit that the conditions of the market would become unimportant. On the other hand, the respondents' position is in essence that so long as the market condition remained the same, as it did in this case under the government supported price at $63 per unit, that there must have been some proof of a change in the market condition which affected the profitableness of the operation. It is clear from the record, that there was no change up until after the period here involved, and at that latter time the market condition changed from $63 to $55 per unit. From the briefs, we are told that the present market is but $13 per unit.

We think a fair reading of the foregoing quoted provision of Paragraph VIII, in view of the other provisions of the lease, indicates that it was *market conditions* upon which the clause depended, that is, not a simple profitable venture ''escape'' or ''exception'' clause as usually appears in mining contracts and as referred to in the quote from 23 A.L.R. (2d) 1015, supra, but rather that it contemplated *a change in the existing market condition* at the time the contract was entered into. It should be remembered in this connection, that the contracting party, the Lessee, had an ample period of time to test the property and did test the property before agreeing to the minimum monthly payment schedule. That this provision in Paragraph VIII related to market conditions, and a change therein, is strengthened by the use of the words ''shall be suspended during any *adverse market condition* but immediately upon the *improvement of the market conditions.''* This language must have referred to some change in the market conditions from the time the contract was entered into. Otherwise the use of the words ''adverse'' and ''improvement'' would have no meaning. In this connection, it should be noted that the lease provision is silent as to the then existing market price. It was known by

all the parties, as appears from the record, that the market price in existence at the time of the lease was a government supported price under the terms of a congressional act and might end at the expiration time of the act or the quota. In addition to the fact that the price was established by the government, there was also an upper limit as to the amount of tungsten trioxide that would be purchased. Therefore the market conditions, known to both parties to the lease, was the government supported market conditions.

Now, considering the previously quoted provisions of Paragraph VIII as an exception clause and, if we find that the clause is ambiguous and uncertain as to whether it means a change in market conditions or rather a failure to make a profit, we believe the rules established by this court make it our duty to determine the exact meaning of the language used by looking to the conduct of the parties. The trial court heard the testimony offered.

Briefly analyzing the Lease, which has heretofore been set out in full, the instrument might be termed two contracts embraced in one instrument. The first of the contractual relations commenced on the 30th of August 1951, when the instrument was signed and executed; the second contract might never have become operative at all but it did become operative by virtue of a written acceptance of it on the part of Burwell, the second party.

The first contract provided for payment of $4,000 to the Lessors within fifteen days after date, and also provided for the entry upon the mining claims to investigate the same, including sampling, excavation, and underground work, and other work "including engineering and geological work necessary to develop the properties and to conduct the work thereof in a *continuous manner with due diligence* * * * unless prevented by inclement weather or acts of God beyond which the Lessee has no control." Emphasis supplied. This major clause, of

due diligence being found in the first contract and not in the second.

Under the first contract, Burwell was to expend $10,000 in such preliminary exploration and after the work was done on the 1st day of April 1952, seven months after the instrument was executed. the Lessee was required to either release of record the Lessors from the Lease and Agreement by written notice or to give written notice to the Lessors of election to proceed under the terms of the Lease and Agreement. Thereafter, the Lessee was to carry out and fulfill the terms, covenants and conditions of the Lease and Agreement as follows:

(1) Pay royalty on ores stockpiled as shown in Paragraph I;

(2) Pay a royalty of 5 percent of the gross millhead without deductions;

(3) Pay between April 1952 and December 1952, minimum royalty of $2,000 per month, such royalty to be considered an advance royalty to be credited by the Lessors on future milling royalties found due;

(4) Pay during the life of the lease after January 1953, $3,500 per month as in Paragraph III;

(5) Provision for payments to credit of Lessors at State Bank and Trust Company, Dillon, Montana;

(6) Provision for suspension of payments upon adverse market conditions in profitable operations as previously discussed; and

(7) That time is of the essence of the Lease and Agreement.

The Lessees did do the first part of the contract, did the exploring, testing and finally entered into the second phase. At that time it did promptly pay to the depository the minimum royalties as provided in Paragraph III. Beginning January 1, 1952, the Lessees paid the minimum royalties of $3,500 promptly each month up to and including September 1. It defaulted on the October payment. After September 1, 1953, however, the Lessees continued to make royalty payments to

one of the Lessors, that is Fleming, up until March of 1955, at which time, the Company bought Fleming's interest for the sum of either $35,000 or $50,000. This continued payment of minimum royalties under the contract to Fleming and the subsequent purchase of Fleming's interest, indicates very much that the Company considered the lease agreement still in effect and also that the property was a valuable property.

Another factor, which is hard to assess but nevertheless appears from the record, is that the Minerals Engineering Company found and developed two other tungsten properties in the immediate area of the leased property in question. Those two properties were much more valuable as to the tungsten trioxide content. The president of the Company testified that several million dollars were made as a profit on the two other properties. This development began in early 1953, significantly not too long before the termination of the minimum royalty payments under this contract. The mill, which had been originally planned for 250 tons, was increased to 1,000 tons to handle the ores from the other properties, and it was testified to that the mill was running at full capacity in 1954 and 1955. In other words, it seems fair to assume, the Company did not need the ores from the leased properties under consideration. It had its government supported price for the tungsten trioxide and more valuable ores to process.

During all of this time there had been a complete examination of the lands by open cuts, tunnels, shafts, bulldozing the surface, sampling and assays, notice of acceptance of the Lease without protest about the minimum royalty terms had been served in writing, and during this time, and all of the time up to the filing of the suits, the Company continued to hold possession of the land and work the same.

It is noted, too, that the life of the contract was for ten years from September 1, 1951. There is no provision in the Lease, such as is often found in mining leases, that the Lessee can walk away, surrender the Lease and move its machinery.

This factor too would tend to indicate that the minimum monthly royalties were the moving consideration for the Lessors to enter into the contract, with the only protection for the Lessee being a change in the market conditions which would prevent profitable operations. It might be said that after the first period of exploration to determine the merits of the property in lieu of the usual provisions as to requiring continued work of a mining property which is leased, the minimum monthly royalty was provided with the "escape" clause as previously set forth.

The evidence produced by the Company to show its defense of unprofitable operations, leaves much to be desired to say the least. The source of the figures, being the Company records, should have shown some degree of continuity and accuracy, but repeated changes of figures were involved. In this connection, we have examined the findings of the District Court as to findings No. 19 and 20, but believe, without the aid of the letter of Burwell, which on its face shows it to be just an estimate, that the figures cannot be sustained. However, this is not important, as we view the case, because the defense of profitable operations must be based upon a change in the market conditions as provided in Paragraph VIII. We find then that the defendant failed to show that the "escape" or "exception clause," contained in Paragraph VIII of the Lease, became applicable.

Having found that the defense failed as to showing an adverse market condition, we next consider whether there was a termination of the Lease effected by the notices of the Lessors that unless the default were corrected within sixty days the Lessees would be dispossessed and in effect the lease terminated.

It should here be noted, that Paragraph VIII provides for arbitration between the parties as to the "exception clause" condition. Arbitration is no longer an issue in the cause, but the existence of the clause concerning arbitration and the subsequent actions of the Lessees are highly persuasive as to

whether or not there was a waiver of the notices of termination by *both parties.*

But, first, we have before us a motion for diminution of the record under our rules. The motion is to include the answer to the amended complaint in .Cause No. 6147, which answer contains an admission that the Lease was still in full force and effect.

The amended answer to the amended complaint did not renew the admission, but rather set up an alternative as previously set out in the appellants' specifications of error and questions submitted. The alternative was in the form of a justification for the failure to pay royalty.

The Lessees' response to the notice of termination was to the effect that they had not defaulted, but had not paid royalty because of market conditions.

We hereby grant the motion for diminution and will consider the conduct of the parties as to whether there was a waiver. See McDonald v. Peters, 128 Mont. 241, 249, 272 Pac. (2d) 730, where this court held the admission of a complaint prior to amendment into evidence was proper to show contradictory positions.

The appellant cites us to the annotation appearing in 120 A.L.R. 557. Here we are not concerned with a unilateral action by a landlord Lessor. Rather we are concerned with a situation where, by their actions, both parties, Lessors and Lessees, assented to the withdrawal of the notice of termination. We could reach the same results on either principles of waiver or estoppel.

After the notice was given, the Lessees gave an excuse or justification for the failure to pay minimum monthly royalty. The Lessees asserted their right to continue under the terms of the written agreement. The Lessees asserted, and later abandoned the right to arbitrate under the agreement. The Lessees continued to pay royalties to one Lessor and then bought him out, thereby becoming a tenant in common. The record reveals that the Lessees attempted to compromise on lower

monthly royalty payments under the same provisions of the contract. In all actions, until this lawsuit (and even then) the parties treated the lease contract as governing their actions. Both parties thus assented to a waiver of the termination notices and will now be estopped to assert it.

But one further matter needs discussion. The trial court ▇ awarded judgment in the amount of $5,928.25 for stockpiling pursuant to the lease. A reading of the lease provisions indicates clearly that it was the intent of the parties that unless milling royalties and stockpiling royalties exceeded minimum monthly royalties, they would not be due. Under our holding, minimum monthly royalties exceeded both other royalties.

We do not find evidence in the record to sustain the trial court that any ore was stockpiled and unmilled within the meaning of the lease. For these reasons we modify the judgment by eliminating the sum of $5,928.25 and as modified affirm the judgment, each party to pay his own costs on appeal.

MR. CHIEF JUSTICE HARRISON and MR. JUSTICE ANGSTMAN concur.

MR. JUSTICE ADAIR specially concurring.

In my opinion, the evidence submitted amply sustains the trial court's judgment as rendered, for which reason I would affirm such judgment in its entirety. However, since the other members of this court are agreed that the judgment rendered in the trial court should be reduced in the sum of $5,928.25 and, with such sum subtracted, that the judgment be affirmed, I concur in such disposition of the appeal.

MR. JUSTICE BOTTOMLY concurring.

I agree and concur in the specially concurring opinion of Justice Hugh Adair.